# NO. 12-17-00328-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *R2 RESTAURANTS, INC.,*<br>*APPELLANT* | § | *APPEAL FROM THE 402ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *MINEOLA COMMUNITY BANK, SSB,*<br>*APPELLEE* | § | *WOOD COUNTY, TEXAS* |

## *OPINION*

R2 Restaurants, Inc. appeals the trial court's declaratory judgment and award of attorney's fees rendered in favor of Appellee Mineola Community Bank, SSB. R2 raises four issues on appeal. We affirm in part and reverse and remand in part.

## BACKGROUND

The instant case arises out of easements on property adjacent to a Wal-Mart parking lot in Wood County, Texas. The property, which consists of two vacant lots, was conveyed by Wal-Mart to Perimeter Properties, L.P. in 1994. At or about that time, Wal-Mart conveyed to Perimeter an easement, which set forth, in pertinent part, as follows:

> WHEREAS, Wal-Mart is the owner of that certain tract or parcel of land situated in the city of MINEOLA, county of WOOD, state of TEXAS identified as Tract 1 on the site plan attached hereto as Exhibit "A" and more fully described on Exhibit "B" ("Tract 1"); and
>
> WHEREAS, Grantee will be by the time this instrument is recorded the owner of that certain 1.117 acre tract or parcel of land in the same city, county, and state, which tract lies adjacent to Tract 1 and is identified as Tract 2 on Exhibit "A" and more fully described on Exhibit "C" ("Tract 2") which tract Wal-Mart Stores, Inc. is current owner of and intends to convey fee simple title to Grantee by a warranty deed; and
>
> WHEREAS, Grantee has requested from Wal-Mart, and Wal-Mart is desirous of granting to Grantee, a non-exclusive easement for pedestrian and vehicular ingress and egress over and across that portion of Tract 1 part of which is identified as Easement A and Easement B on Exhibit

"A" and more fully described on Exhibit "D," which Easement A and Easement B are actually the drive way/curb cut connectors to the limits of agreed access (collectively the "Access Area").

NOW THEREFORE, in consideration of one dollar ($1.00) and other good and valuable consideration, Wal-Mart does hereby grant, sell, and convey to Grantee a non-exclusive, perpetual easement for the benefit of and appurtenant to Tract 2, for the purpose of vehicular and pedestrian ingress and egress over and across the Access Area, and then across Tract 1 to the extent necessary and convenient for access between Tract 2 and State Highway 37 and State Highway 584, to have and to hold, unto Grantees, its successors and assigns, and all of their tenants and their respective customers, invitees, employees, agents, contractors, and suppliers . . . .

. . . .

7. Duration. The agreements contained herein and the rights granted hereby shall run with the titles to Tract 2 and the Access Area and shall bind and enure to the benefit of the parties hereto and their respective heirs, successors, and assigns.

The site plan comprising Exhibit "A" to the Wal-Mart easement depicts the tracts and easements, in pertinent part, as follows:



In 1995, Perimeter conveyed the north lot to UP Enterprises, a Taco Bell franchisee. Around that time, Perimeter and UP entered into a reciprocal easement agreement (REA).[1]  The REA stated, in pertinent part, as follows:

---

[1] R2 is the successor in interest to UP.  Joe Upshaw, who signed the REA, owned sixty percent of UP.  His son, Richard, owned the remaining forty percent of UP.  When Joe passed away a year following the execution of the REA, his interest passed to Richard, who is the owner of R2.

WHEREAS, Perimeter Properties, L.P. and UP Enterprises, Inc. wish to grant to each other certain easement rights for the benefit of their respective tracts and impose certain obligations and restrictions;

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Perimeter Properties, L.P. and UP Enterprises, Inc. do hereby agree as follows:

. . . .

2.     <u>Perimeter Properties, L.P. to UP Enterprises, Inc. Access Easement</u>. Perimeter Properties, L.P. does hereby grant to UP Enterprises, Inc. a perpetual non-exclusive easement for pedestrian and vehicular ingress and egress over and across the drive lanes and sidewalks, and entrances on Tract 1 identified as (the "Access Easement 1") attached hereto and shown on <u>Exhibit D</u>. UP Enterprises, Inc. shall use the Access Easement 1 for vehicular and pedestrian ingress, access and egress. The Access Easement granted hereunder is a permanent easement and will continue in full force and effect so long as the easement is used by the owners of Tract 1 and Tract 2, its successors and assigns pursuant to this document recorded in the Real Property Records of Wood County, Texas. Access Easement 1 shall be used by UP Enterprises, Inc., its customers, employees, tenants and invitees.

3.     <u>UP Enterprises, Inc. to Perimeter Properties, L.P. Access Easement</u>. UP Enterprises, Inc. does hereby grant to Perimeter Properties, L.P. a perpetual, non-exclusive easement for vehicular and pedestrian ingress and egress over and across the drive lanes, sidewalks and entrances on Tract 2 identified as (the "Access Easement 2") attached hereto as <u>Exhibit D</u> and made a part hereof. Perimeter Properties, L.P. shall use Access Easement 2 for vehicular and pedestrian ingress, access, and egress. The Access Easement 2 granted hereunder is a permanent easement and will continue in full force and effect so long as the easement is used by the owners of Tract 1 and Tract 2, its successors and assigns pursuant to this document recorded in the Real Property Records of Wood County, Texas. The Access Easement 2 shall be used by Perimeter Properties, L.P., its customers, employees, tenants and invitees.

. . . .

8.     <u>Successors</u>. The rights and obligations contained herein shall run with the title to Tract 1 and Tract 2 and shall bind and inure to the benefit of the respective successors and assigns of the parties hereto.

9.     <u>Severability</u>. In the event that any of the terms or conditions of this Reciprocal Easement Agreement shall be deemed invalid, illegal, or unenforceable in any respect, the validity of the remainder of this Reciprocal Easement Agreement shall in no way be affected and shall remain in full force and effect to the fullest extent permitted by law.

10.     <u>Development Plan</u>. Prior to commencing site grading on Tract 2, UP Enterprises, Inc., shall provide to Perimeter Properties, L.P. a Plan of Development for approval which includes exterior plans, specifications, and curb cuts showing the placement of buildings and other improvements, including signage, setbacks from lot lines, location and dimensions of parking areas and spaces, driveways, service areas and landscaping and such approval shall not be unreasonably withheld.

(a)     <u>Sanitary Sewer</u>. UP Enterprises, Inc. shall design and construct an 8" sanitary sewer line and in accordance with plans and specifications approved by Perimeter Properties, L.P.'s engineers, Doucet & Associates . . . .

3

(b) <u>Curb Cuts</u>. UP Enterprises, Inc. shall design and construct two curb cuts to the Wal-Mart parking lot, two curb cuts to the Perimeter Properties, L.P. parking lot and the mutual access drive from State Highway 37 located as shown on the site plan attached hereto as <u>Exhibit A</u>, in accordance with plans and specifications approved by Perimeter Properties, L.P.'s engineers, Doucet & Associates . . . .

. . . .

14. <u>Duration</u>. All covenants, conditions and restrictions shall remain in force for fifty (50) years.

The site plan comprising Exhibit "A" to the REA depicts the tracts and easements, in pertinent part, as follows:



Further, Exhibit "D" to the REA depicts the tracts and easements, in pertinent part, as follows:

4



UP installed a "mutual access" lane between the two lots. But neither Perimeter nor its successors installed a "mutual access" driveway to Highway 564.

That same year, UP constructed a Taco Bell franchise on the north lot. R2 has owned and operated this Taco Bell franchise continuously since 1995. For seven and one-half years, the south lot remained vacant. But on June 25, 2002, Perimeter and UP executed an Amendment to the REA, in part to correct representations of ownership set forth in the REA. The amendment further states that "'Access Easement' shall mean the driveways, walkways and sidewalks, curb cuts, exits and entrances and other common areas as may from time to time exist on [the south lot]."

Fifteen Thirteen, LLC later acquired the south lot and constructed a car wash on it in July 2002. During that time, Fifteen Thirteen constructed a driveway from the south lot to Highway 37. On September 24, 2010, Fifteen Thirteen sold the south lot to MCB. MCB demolished the car wash building in 2011, but left in place the pad and concrete driveway connecting the two lots at the mutual access easement on the eastern side of the lots. During the years that followed, MCB's activities on the lot were limited to having someone mow the grass, placing an advertising sign on the lot for the bank, and permitting community groups to put signs at the

5

corner of the lot. The following aerial photograph of the property as it currently exists is part of the record in this case:



In 2016, R2 commenced reconstruction of the Taco Bell located on the north lot. The new restaurant was to be built in accordance to a corporate prototype plan, one aspect of which required the dumpster to be placed as far away from customers as possible. Prior to the commencement of construction, Chet Davis, R2's vice president, contacted James Herlocker, MCB's president, and asked if R2's contractor could place a small portable building and a temporary dumpster on the south lot during construction. Herlocker gave permission for the contractor to do so.

During construction, a new dumpster enclosure was constructed in the southeast corner of the north lot where the easement between the two lots was located. Furthermore, the curb cut at the location of the easement between lots on their western sides was closed. Thereafter, Herlocker complained to Davis about the location of the dumpster enclosure. In response, Davis suggested that MCB get its own easement from Wal-Mart to access the Wal-Mart parking lot. MCB also contacted the Texas Department of Transportation (TXDOT) about installing a driveway from the south lot to Highway 564, but TXDOT denied its request.[2]

---

[2] The record reflects that under TXDOT regulations in effect at the time the REA was executed, the installation of a driveway from the south lot to Highway 564 was permissible, but the installation of such a driveway would violate current TXDOT regulations.

6

MCB filed the instant suit seeking, among other things, a declaratory judgment that the REA remained in effect and granted MCB access over the north lot. MCB also sought to recover attorney's fees. R2 filed a counterclaim, by which it sought a declaratory judgment that the REA terminated prior to its constructing the new dumpster enclosure, MCB has no rights under the 1994 Wal-Mart easement, and MCB breached the REA by not installing the Highway 564 entrance. R2 also sought to recover attorney's fees.

Following a bench trial, the trial court rendered a declaratory judgment in MCB's favor and denied R2's counterclaim and request for attorney's fees. In accordance with its findings of fact and conclusions of law, the trial court, in its judgment, declared that the REA remained in effect, ordered R2 to remove the obstruction to the easement, enjoined R2 from obstructing the easement, and awarded MCB $80,620 in attorney's fees through trial and $20,000 for attorney's fees in the event of an unsuccessful appeal. This appeal followed.

### TERMINATION OF THE REA

In its first issue, R2 argues that the REA terminated before R2 relocated its dumpster enclosure to the southeastern corner of the north lot. Specifically, R2 contends that the REA terminated either (1) in accordance with its terms, (2) due to impossibility of performance on MCB's part, (3) as a result of material breach on the part of MCB and its predecessors in title, or (4) due to failure of consideration. R2 further argues that its closing of the west side curb cut during the 2016 construction project is irrelevant because of the REA's prior termination. Lastly, R2 argues that several of the trial court's findings and conclusions related to this issue are either erroneous or irrelevant.

### Standards of Review

R2's issues concern contractual interpretation and evidentiary sufficiency. The applicable standards of review are discussed below.

#### *Contractual Interpretation*

A written agreement is ambiguous only if, after the application of established rules of construction, an agreement is still susceptible to more than one reasonable meaning. *See RSI Int'l, Inc. v. CTC Transp., Inc.*, 291 S.W.3d 104, 106 (Tex. App.–Fort Worth 2009, no pet.); *see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). If a contract is unambiguous, its terms can be interpreted as a matter of law by the court.

*Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). When an issue turns on a question of law, we do not give any particular deference to legal conclusions of the trial court and apply a de novo standard of review. *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 868 (Tex. App.–Austin 2001, pet. denied).

When an appellate court concludes that contractual language can be given a certain or definite meaning, then the language is not ambiguous, and the appellate court is obligated to interpret the contract as a matter of law. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999); *Loaiza v. Loaiza*, 130 S.W.3d 894, 905 (Tex. App.–Fort Worth 2004, no pet.).

*Evidentiary Sufficiency*

Moreover, a trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Lindemann Properties, Ltd. v. Campbell*, 524 S.W.3d 873, 880 (Tex. App.–Fort Worth 2017, pet. filed); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

There is a general presumption of validity extending to the judgment of a court of general jurisdiction, regardless of whether the judgment is the result of a jury trial or a bench trial. *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 250 (Tex. App.–Houston [14th Dist.] 1999, pet. denied); *In re Estate of Miller*, 446 S.W.3d 445, 450 (Tex. App.–Tyler 2014, no pet.). The court's findings of fact form the basis of the judgment upon all grounds of recovery and defenses. TEX. R. CIV. P. 299. When a court makes fact findings but inadvertently omits an essential element of a ground of recovery or defense, the presumption of validity will supply by implication any omitted unrequested element that is supported by evidence. *See id.*

We may review conclusions of law to determine their correctness based upon the facts, but we will not reverse because of an erroneous conclusion if the trial court rendered the proper judgment. *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)); *Campbell*, 524 S.W.3d at 880.

## Governing Law

In a declaratory judgment action, the party who asserts an affirmative claim for relief has the burden of proving its allegations. *Garden Oaks Maint. Org. v. Chang*, 542 S.W.3d 117, 129 (Tex. App.–Houston [14th Dist.] 2017, no pet.). Here, R2 pleaded that the REA terminated in accordance with its own terms. *See Azad v. Aaron Rents, Inc.*, No. 14-07-01087-CV, 2009 WL 4842761, at *4–6 (Tex. App.–Houston [14th Dist.] Dec. 17, 2009, no pet.) (mem. op.) (categorizing condition subsequent as an affirmative defense).[3]

An easement is a nonpossessory interest that authorizes a holder's use of property for only a particular purpose. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002). Ordinarily, intent to abandon an easement must be established by clear and satisfactory evidence, and abandonment of an easement will not result from nonuse alone; instead, the circumstances must disclose some definite act showing an intention to abandon and terminate the right possessed by the easement owner. *See Toal v. Smith*, 54 S.W.3d 431, 437 (Tex. App.–

---

[3] R2 describes the *lack of use* language in the REA as a "conditional limitation." The primary distinction between a conditional limitation and a condition subsequent is whether the happening of an event automatically terminates the estate without the necessity of reentry versus the happening of an event, which gives the grantor the right to terminate the estate by reentry. *See Field v. Shaw*, 535 S.W.2d 3, 5 (Tex. Civ. App.–Amarillo 1976, no writ). We need not determine if the language of the REA imposed a conditional limitation or a condition subsequent. Here, R2 raised the matter defensively to MCB's claim that it had property rights under the REA, and we conclude that the matter constitutes an affirmative defense, on which R2 bore the burden of proof. *Cf. Azad*, 2009 WL 4842761, at *4–6.

9

Waco 2001, pet. denied). But the easement holder's rights are limited to those that are expressed in the grant. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 103 (Tex. 1999). Thus, it is reasonable that we apply basic principles of contract construction and interpretation when considering this express easement's terms. *See Marcus Cable*, 90 S.W.3d at 700; *Parks*, 1 S.W.3d at 100. We give the terms their plain and ordinary meaning when they are not expressly defined, and we read the terms of an easement as a whole to determine the parties' intentions and to carry out the purpose for which the easement was created. *Marcus Cable*, 90 S.W.3d at 701; *Parks*, 1 S.W.3d at 101. We assume that the parties intended for every clause to have some effect. *Koelsch v. Indus. Gas Supply Corp.*, 132 S.W.3d 494, 498 (Tex. App.–Houston [1st Dist.] 2004, pet. denied).

## Termination of the REA in Accordance with Its Terms

R2 argues that the evidence conclusively demonstrates that the REA terminated in accordance with its terms. Specifically, it argues that the parties and their respective predecessors in title did not use the tract in accordance with the uses described in the REA and, as a result of this nonuse, the easements terminated.

We first review the language of the easement to determine if it unambiguously sets forth the parties' obligations to avoid its termination. The REA sets forth that the access easements "will continue in full force and effect so long as [they are] used by the owners of Tract 1 and Tract 2, [their] successors and assigns" pursuant to its terms.

### Failure to Construct Highway 564 Entrance

R2 first argues that since no owner of the south lot installed an entrance to Highway 564 as depicted on Exhibit "D," the owners of the two lots never used that entrance and the REA terminated as a result of this nonuse. On Exhibit "D," this entrance is described as a "Mutual Access" easement. The amendment to the REA states that the phrase "Access Easement" means "the driveways, walkways and sidewalks, curb cuts, exits and entrances and other common areas as *may* from time to time exist on Tract 1." (emphasis added). The use described in the REA is "for vehicular and pedestrian ingress, access, and egress." The REA further mandates that UP shall design and construct curb cuts at certain locations on the property, but imposes no such obligation on Perimeter or its successors.

We initially note that the easement abutting Highway 564 as shown on Exhibit "D" is one of mutual "access" as compared to the driveway subject of one of UP's curb cuts, which is

10

labeled "Mutual Ingress/Egress." We reiterate that, according to the language of the amendment to the REA, an "access easement" includes common areas as "may from time to time exist on [the south lot]." The word "access" means, among other things "freedom or ability to . . . make use of something." *Access*, Merriam-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2011). Based on our reading of the REA and its exhibits, we conclude, that nothing therein required UP or its successors, including MCB, to construct a curb cut, driveway, or other entryway from the south lot to Highway 564, and the owners of the south lot's failure to undertake such construction, without more, has not interfered with R2's right of access to that portion of the south lot.[4]

### *Failure of Consideration*

R2 further contends that the REA terminated due to a failure of consideration. Specifically, it contends that the stated purpose of the REA was the granting of reciprocal easements by the parties for the benefit of their respective tracts and R2 did not receive the promised entrance to Highway 564.

Failure of consideration, an affirmative defense, occurs when, because of some supervening cause after a contract is formed, the promised performance fails. *See* TEX. R. CIV. P. 94; *Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex. App.–Tyler 2010, no pet.). As set forth above, nothing in the REA required UP or its successors, including MCB, to construct a curb cut, driveway, or other entryway from the south lot to Highway 564, and the various owners of the south lot's failure to undertake such construction, without more, has not interfered with R2's right of access to that portion of the south lot. Therefore, there is no failure of consideration.

Further still, R2 and its predecessors received other consideration in accordance with the stated purpose of the REA. Consideration is a present exchange bargained for in return for a promise and consists of benefits and detriments to the contracting parties. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). The detriments must induce the parties to make the promises, and the promises must induce the parties to incur the detriments. *Id.*

Here, the REA set forth that UP would construct a sewer line and Perimeter would reimburse UP for the cost of that sewer line. The evidence presented at trial reflects that the

---

[4] As a result of this conclusion, we need not address (1) R2's alternative argument that the REA terminated because of the impossibility of installing the entrance to Highway 564 due to TXDOT regulations concerning the distance requirements between driveways and highway intersections or (2) whether MCB's or its predecessors' failure to construct a driveway to Highway 564 amounted to material breach of the REA. *See* TEX. R. APP. P. 47.1.

sewer line constructed passes under the south lot and connects to another sewer line running along Highway 564. The evidence further indicates that R2 has used this sewer line from the time of its construction up to and including the time of trial. Thus, we conclude that even assuming that there was failure of some consideration as R2 contends, the REA would not be entirely devoid of consideration.

### *Failure to Use the Easements*

We next consider R2's contention that the parties lack of use of the various mutual access easements caused the REA to terminate in accordance with its terms. At oral argument of this case, R2 suggested that the period of time after which the REA would terminate for this reason should be implied to be a "reasonable" period of time.[5] We agree. In making this determination, we will consider whether there is legally sufficient evidence to support the trial court's implied finding that any periods of nonuse by an owner of the south lot do not exceed a reasonable period of time. *See **Joines v. Burke**,* 540 S.W.2d 798, 801 (Tex. Civ. App.–Corpus Christi 1976, no writ). Thus, we interpret R2's argument to be that the evidence conclusively establishes that any period of nonuse extended beyond a reasonable period of time. *See **Castillo**,* 444 S.W.3d at 620.

For a trial court to imply a term into an agreement, it must appear that it is necessary to do so in order to effectuate the purposes of the contract as a whole as gathered from the written instrument. *See **Westerngeco, L.L.C. v. Input/Output, Inc.**,* 246 S.W.3d 776, 783 (Tex. App.–Houston [14th Dist.] 2008, no pet.). What constitutes a reasonable time must be determined by the circumstances in evidence surrounding the situation of the parties and the subject matter under which the contract was executed. ***Hall v. Hall**,* 308 S.W.2d 12, 16–17 (Tex. 1957). The fact that such determination is usually a question of fact and almost always is made well after the date of the contract does not make it depend on facts arising after the contract. *See **id.***

In this case, the REA fails to set forth what period of nonsuse will result in termination. However, the REA does set forth that "[a]ll covenants, conditions and restrictions shall remain in force for fifty (50) years." This language does not apply directly to the granting clause creating the easements since an easement is distinct from a covenant or a restriction. *See **Hubert v. Davis**,* 170 S.W.3d 706, 711 (Tex. App.–Tyler 2005, no pet). Nonetheless, since the overall

---

[5] The trial court made fact findings related to this defensive issue, but omitted the element of whether any period of nonuse extended past a reasonable period of time. There is no indication from the record that this omission was anything but inadvertent. *See **Vickery**,* 5 S.W.3d at 252–53. Accordingly, the presumption of validity will supply by implication this omitted, unrequested element, and we will consider whether there is sufficient evidence to support the trial court's implicit finding. *See **Miller**,* 446 S.W.3d at 450.

purpose of the contract at issue was the grant of reciprocal access easements, the trial court reasonably could have found this duration clause to be a helpful guide in determining what a reasonable period of nonuse might be or when such a period might commence. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (in construing written contract, court must consider entire writing in an effort to harmonize and give effect to all provisions of contract so that none will be rendered meaningless).

Moreover, at the time of the REA's execution, the evidence reflects that the north and south lots were vacant. And there is no language in the REA or elsewhere in the record mandating that the owner of either of the lots build commercial structures. It would not be uncommon or unwise for a party to buy a commercial lot, allow it to remain vacant, and later sell it in its unimproved state. Indeed, the record reflects that Perimeter never constructed businesses on either lot. The mutual access easements undoubtedly add value to the south lot, regardless of whether there is a commercial business operating on it. Thus, since at the time of the REA's execution, these commercial lots were vacant, the trial court reasonably could have found that a reasonable period of nonsuse would be a long period of time, particularly for the easements on the south lot since it has been vacant for longer periods of time.

Further still, as R2 notes in its brief, the REA requires use by the owners of both lots. However, the evidence reflects that the north lot contains entrances to the Wal-Mart parking lot and the only entrance of ingress and egress on the south lot is to Highway 37, a highway to which the north lot already has access. As a result, the trial court reasonably could have found a reasonable period of nonuse for the north lot to be longer than a reasonable period of nonuse for the south lot.

The evidence at trial reflects that after the REA was executed, the south lot remained vacant for seven and one half years. The evidence further reflects that in June 2002, the parties executed an amendment to the REA. The evidence indicates that a car wash was operated on the south lot from July 2002, until September 2010, and the access easement was used during that time. The evidence also indicates that MCB demolished the car wash in 2011. The evidence reflects that from that point forward, MCB hired someone to mow the property once per week, placed an advertising sign for the bank on the property, permitted others to access the property to place signage, and, in 2016, gave permission for R2's contractor to access the south lot to set up a temporary building and dumpster in connection with its construction activities on the north lot.

13

The evidence further reflects that Taco Bell employees were instructed to park as far away from the front door as possible and, as a result, employees would park their cars in the southeast corner of the north lot facing the driveway located on the northeast corner of the south lot.[6]

From this evidence, the trial court reasonably could have made implied findings that (1) there was approximately a seven-year period of nonuse from the date the REA was executed until June 2002, at which time the parties acknowledged the continued existence of the REA by executing an amendment to it,[7] (2) following less than a month of nonuse, Fifteen Thirteen used the easements continuously in its operation of the carwash until September 2010, (3) following a period of nonuse, MCB used the easements while demolishing the car wash, (4) MCB used the easements to access the south lot to mow it on a weekly basis, and place an advertising sign, (5) after the car wash was demolished, R2 employees regularly accessed a portion of the easement abutting the driveway to park their cars, (6) in 2016, R2 used the easement to access the south lot while engaging in construction on its new Taco Bell facility, and (7) none of these periods of nonuse exceeded a reasonable period of time.

Having considered the circumstances existing at the time of the execution of the REA and the evidence of varying periods of use and nonuse by the parties, we conclude that there is legally sufficient evidence to support the trial court's implicit finding that any period of nonuse on the part of the owners of the north and south lots did not extend beyond a reasonable time so as to cause the REA to terminate by its own terms.

### Specific Challenges to Findings and Conclusions

Lastly, R2 makes specific challenges to numerous findings of fact, conclusions of law, and resultant rulings made by the trial court. Among these challenges,[8] the following are germane to the foregoing discussion:

---

[6] The record reflects that there were parking lines drawn on this part of the north lot, within the access easement.

[7] At trial, Richard Upshaw, R2's president, testified that the REA was in full force and effect when he signed the amendment to the REA.

[8] R2 also references Findings of Fact 10, 11, 13, 15, 20, Conclusion of Law 8, and Rulings 2, 3, and 5. None of these findings of fact or conclusions of law are relevant to our de novo review of the unambiguous language of the REA or our consideration of the evidence as it pertains to the implied finding of whether a reasonable period of nonuse of the easements had taken place. R2's challenges regarding the remaining rulings of the trial court are based on its contention that the REA terminated.

**Finding of Fact No. 8**

No express requirement that Plaintiff construct access to State Highway 564 exists in any of the documents related to the property [that is] the subject of this litigation.

**Finding of Fact No. 17**

Both parties enjoyed the benefit of the concrete driveway that traverses Plaintiff's property and connects Highway 37 and the curb cut on Defendant's property adjoining the Wal-Mart Property.

**Conclusion of Law No. 6**

Defendant's failure to include express language in the easement agreement, either at the time of the original 1995 sale or the 2002 amendment to same, requiring Plaintiff to construct road access to State Highway 564 supposes a tacit agreement that Mineola Community Bank was under no obligation to do so in order to maintain its Reciprocal Easement Agreement with R2 Restaurants, Inc.

**Court's Ruling No. 1**

The Reciprocal Easement Agreement between R2 Restaurants, Inc. and Mineola Community Bank is valid and in existence.

**Court's Ruling No. 4**

R2 Restaurants, Inc. and Mineola Community Bank both enjoyed the benefit of the Reciprocal Easement Agreement prior to the intentional obstruction of the same by R2 Restaurants, Inc.

As set forth above, we have conducted a de novo review of the REA and its amendment and have reviewed the record to conduct our analysis of sufficiency of the evidence. Having done so, we conclude that there is no error in the aforementioned findings of fact, conclusions of law, or rulings made by the trial court. R2's first issue is overruled.

## MCB'S RIGHTS PURSUANT TO THE WAL-MART EASEMENT

In its second issue, R2 argues that the trial court erred by failing to rule on R2's counterclaim for declaratory judgment concerning the parties' rights under the access easement granted by Wal-Mart to Perimeter. However, the trial court did, in fact, make the following findings of fact and conclusions of law[9] concerning the Wal-Mart easement:

---

[9] These findings of fact and conclusions of law are designated as Findings of Fact 1–3. However, we construe Findings of Fact 2 and 3 as conclusions of law. *Cf. Simpson v. Curtis*, 351 S.W.3d 374, 379 n.1 (Tex. App.–Tyler 2010, no pet.).

15

Wal-Mart Stores, Inc. conveyed by warranty deed a 1.117 acre tract connected and adjacent to its Mineola location to Perimeter Properties, LP in 1994.

Contemporaneously with the warranty deed conveyance, Wal-Mart Stores, Inc. granted Perimeter Properties, LP, a non-exclusive, express easement for pedestrian and vehicular ingress and egress over and across that portion of Wal-Mart's property for the benefit of Perimeter Properties, LP, its successors and assigns.

The Access Easement granted to Perimeter Properties, LP by Wal-Mart was perpetual, non-exclusive and granted to allow access to Highway 37 and State Highway 564 via curb cuts to Wal-Mart property. Two curb cuts were expressly noted in the original reciprocal easement document.

In its counterclaim, R2 alleged that the Wal-Mart easement was intended only to benefit the north lot. Because the trial court denied R2's counterclaims, we will conduct a de novo review of the legal correctness of the trial court's implicit conclusion of law that the plain meaning of the Wal-Mart easement demonstrated that the parties intended that the entire 1.117 acre tract receive the benefit of the easements.

As set forth above in greater detail, the Wal-Mart easement states that (1) Wal-Mart is the owner of Tract 1, (2) Perimeter is the owner of the 1.117 acre tract adjacent to Tract 1, which is identified as Tract 2 on Exhibit "A," (3) Perimeter requested and Wal-Mart desired to grant Perimeter a nonexclusive easement for pedestrian and vehicular ingress and egress over and across that portion of Tract 1 part of which is identified as Easement "A" and Easement "B" on Exhibit "A." Further still, the Wal-Mart easement sets forth, in pertinent part, as follows:

Wal-Mart does hereby grant, sell, and convey to [Perimeter] a non-exclusive, perpetual easement **for the benefit of and appurtenant to Tract 2**, for the purpose of vehicular and pedestrian ingress and egress over and across the Access Area, and then across Tract 1 to the extent necessary and convenient **for access between Tract 2 and State Highway 37 and State Highway 584**, to have and to hold, unto [Perimeter], its **successors** and assigns, and all of their tenants and their respective customers, invitees, employees, agents, contractors, and suppliers . . . .

. . . .

7. Duration. The agreements contained herein and the rights granted hereby **shall run with the titles to Tract 2** and the Access Area and shall bind and enure to the benefit of the parties hereto and their respective heirs, **successors**, and assigns.

(emphasis added).

The plain language of the Wal-Mart easement sets forth that the easement is intended to benefit Tract 2 for access between Tract 2 and Highway 37 and Highway 584. It further states that the rights granted shall run with the titles to Tract 2 and shall bind and enure to the benefits

of the parties and their respective successors. The site plan comprising Exhibit "A" to the Wal-Mart easement, plainly indicates with two distinct arrows that "Tract 2" includes both the north and south lots, which, as R2 notes in its brief, were separately platted when Wal-Mart granted Perimeter the easement. And when Perimeter conveyed the north lot to UP, it did not need to reserve right of access to the Wal-Mart easements for the south lot since both lots are part of "Tract 2" under the Wal-Mart easement. Thus, despite the fact that Perimeter conveyed the north lot to UP "with all rights tenements, appurtenances and hereditaments[,]" the south lot retained its rights under the Wal-Mart easement by virtue of its being part of "Tract 2" under the plain language of the easement. But even if we assume that the rights to the Wal-Mart easement passed to the north lot with its sale by Perimeter to UP, the fact remains that "Access to Wal-Mart" is plainly indicated on Exhibits "A" and "D" to the REA.

Based on our consideration of the plain language of the Wal-Mart easement and its exhibits, we conclude that the trial court reasonable could have determined that the easements were granted to the entirety of Tract 2, which consisted of the north and south lots and Perimeter's sale of the north lot to UP did not divest the south lot owners of their rights under that easement. R2's second issue is overruled.

## R2'S ATTORNEY'S FEES

In its third issue, R2 argues that the trial court abused its discretion in denying its request for attorney's fees. However, R2's third issue is entirely premised on this court's reversing the trial court's declaratory judgment. Since we overruled R2's first and second issues, we likewise overrule R2's third issue.[10]

## MCB'S ATTORNEY'S FEES

In its fourth issue, R2 argues that the trial court abused its discretion in awarding MCB attorney's fees of $80,620 and $20,000 in the event of an unsuccessful appeal on R2's part. Specifically, R2 argues that MCB, by way of its counsel's testimony, elected to establish its entitlement to attorney's fees using the lodestar method and that the evidence is insufficient to support the fees awarded under this method.

---

[10] We are mindful that a trial court may award attorney's fees to a nonprevailing party in a declaratory judgment action. *See* **Feldman v. KPMG LLP**, 438 S.W.3d 678, 685 (Tex. App.–Houston [1st Dist.] 2014, no pet.).

Texas Civil Practice and Remedies Code, Section 37.009, permits recovery of attorney's fees in a declaratory judgment action so long as those fees are proven to be reasonable and necessary, as well as equitable and just. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015). A "reasonable" attorney's fee is one that is not excessive or extreme, but rather moderate or fair. *Helms v. Swansen*, No. 12-14-00280-CV, 2016 WL 1730737, at *6 (Tex. App.–Tyler Apr. 29, 2016, pet. denied) (mem. op.). We review the decision by a trial court to either grant or deny attorney's fees under an abuse of discretion standard, and we review the amount awarded as attorney's fees under a legal sufficiency standard. *EMC Mortg. Cor. v. Davis*, 167 S.W.3d 406, 418 (Tex. App.–Austin 2005, pet. denied). In conducting our review, we consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). If more than a scintilla of evidence supports the challenged finding, the legal sufficiency challenge fails. *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003).

The lodestar method for proving attorney's fees involves evidence relating the hours worked for each attorney multiplied by their respective hourly rates for a total fee. *See Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014); *Helms*, 2016 WL 1730737, at *6. The supreme court has held that where a party elects to use the lodestar method, it must offer evidence of the time expended on particular tasks. *See Griffin*, 442 S.W.3d at 255. That party must provide evidence that is sufficiently specific to allow the factfinder to determine the amount of time spent on a particular task and to decide whether that length of time was reasonable. *El Apple I Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012).

At trial, MCB's attorney testified that she charged an hourly rate of three hundred dollars. She further testified that six different attorneys at her firm worked on the case at different times. She referenced each associate attorney by name, along with that attorney's hourly rate. She stated that these rates were reasonable "within the area." She further stated that the total attorney's fees for the case is $80,620, which she described as reasonable for the instant case "due to the time and labor and the novelty and difficulty" of it. MCB's attorney also made reference to an "extensive Motion for Summary Judgment" she and her associates prepared in conjunction with the case as well as to time spent prior to filing suit in an effort to resolve the matter without litigation. She described the time spent in general terms as "ten months of a lot of research and writing." She also requested attorney's fees for an appeal to an intermediate

18

appellate court in the amount of $20,000 and an appeal to the Texas Supreme Court in the amount of $30,000. In conclusion, she reiterated that the fees were "certainly reasonable and necessary and appropriate" for the time spent on the case.

Based on our interpretation of the holdings from the Texas Supreme Court and the holdings of our sister courts, we interpret MCB's attorney's reference to her and her associates' respective hourly rates as an election to use the lodestar method. *See Helms*, 2016 WL 1730737, at *7 (citing **Long**, 442 S.W.3d at 255) ("The affidavit supporting the Griffins' request for attorney's fees used the lodestar method by relating the hours worked for each of the two attorneys multiplied by their hourly rates for a total fee."); *see also* **City of Larado v. Monano**, 414 S.W.3d 731, 736 (Tex. 2013) (holding that property owner chose to prove up attorney's fees using lodestar method by testifying that he arrived at his fee by multiplying the number of hours worked by his hourly rate); **Felix v. Prosperity Bank**, No. 01-014-00997-CV, 2015 WL 9242048, at *3–4 (Tex. App.–Houston [1st Dist.] Dec. 17, 2015, no pet.) (mem. op.) (applying **El Apple I** requirements where attorney seeking fees pursuant to Texas Civil Practice and Remedies Code, Section 38.001 presented evidence of his hourly fee); **Auz v. Cisneros**, 477 S.W.3d 355, 359–60 (Tex. App.–Houston [14th Dist.] 2015, no pet.) (holding that **El Apple I** requirements apply where attorney seeking fees pursuant to Texas Civil Practice and Remedies Code, Section 38.001 presented evidence that he arrived at his total fee by multiplying his hourly fee by number of hours he worked); *but see* **In re E.B.**, No. 05-14-00295-CV, 2015 WL 5692570, at *2 (Tex. App.–Dallas Sept. 29, 2015, no pet.) (mem. op.) (in case brought pursuant to family code, party who presented evidence of hourly fee and number of hours held to have used traditional method, not lodestar method); **Myers v. Sw. Bank**, No. 02-14-00122-CV, 2014 WL 7009956, at *6 (Tex. App.–Fort Worth Feb. 5, 2015, pet. denied) (mem. op.) (although attorney testified as to his hourly rate and number of hours worked, court characterized case as "ordinary hourly-fee breach of contract case" not requiring time sheets or other detailed hour calculations); **Ferrant v. Graham Assocs., Inc.**, No. 02–12–00190–CV, 2014 WL 1875825, at *7–8 (Tex. App.–Fort Worth May 8, 2014, no pet.) (mem. op.) (although attorney testified as to his hourly rate and number of hours worked, court characterized case as "ordinary non-lodestar, hourly-fee breach of contract case" not requiring hourly time records); **Metroplex Mailing Servs., LLC v. R.R. Donnelley & Sons Co.**, 410 S.W.3d 889, 900 (Tex. App.–Dallas 2013, no

pet.) (drawing distinction between cases governed by lodestar approach and "nonlodestar awards of fees such as those made in breach of contract cases").

Therefore, based on MCB's election, it was required to introduce sufficient evidence to allow the trial court to apply the lodestar method. *See Helms*, 2016 WL 1730737, at *7. MCB's attorney noted the complexity of this case, set forth her and her associates' hourly rate, which she characterized as reasonable and necessary, and asked for a total amount in attorney's fees, which, presumably, she calculated by multiplying the various hourly rates by the number of hours worked. *See id.* MCB's attorney's testimony is generalized. *See id.* Counsel did not provide testimonial evidence of the time expended on specific tasks. *See id.* Further, she presented no documentation in support of her request for fees. *See id.* Without any evidence of the time spent on specific tasks, the trial court did not have enough evidence to review the fee request in a meaningful manner. *See id.*; *see also Long*, 442 S.W.3d at 255. Thus, we conclude that the trial court was not provided sufficient evidence to calculate a reasonable fee. *See Long*, 442 S.W.3d at 254–55; *Helms*, 2016 WL 1730737, at *7. Accordingly, we hold that the trial court's award of attorney's fees to MCB amounted to an abuse of discretion. R2's fourth issue is sustained in part.[11]

## DISPOSITION

We have overruled R2's first, second, and third issues and overruled its fourth issue in part. Having done so, we *reverse* the portion of the trial court's judgment awarding attorney's fees to MCB and *remand* the cause to the trial court for further consideration of the issue of MCB's entitlement to attorney's fees, if any. We *affirm* the remainder of the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered July 25, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

---

[11] We do not reach the merits of R2's alternative arguments in its fourth issue. *See* TEX. R. APP. P. 47.1.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 25, 2018**

**NO. 12-17-00328-CV**

**R2 RESTAURANTS, INC.,**
Appellant
V.
**MINEOLA COMMUNITY BANK, SSB,**
Appellee

Appeal from the 402nd District Court

of Wood County, Texas (Tr.Ct.No. 2016-760)

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the portion of the trial court's judgment awarding attorney's fees to MCB be **reversed** and the cause **remanded** to the trial court **for further** consideration of the issue of MCB's entitlement to attorney's fees, if any, the remainder of the trial court's judgment is **affirmed**, and that the costs of this appeal are hereby assessed one-half against the Appellant, **R2 RESTAURANTS, INC.,** and one-half against the Appellee, **MINEOLA COMMUNITY BANK, SSB,** in accordance with the opinion of this court; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*